Thank you, Your Honor. My name is Rob Fowler, and I represent the appellate Southern Coal Corporation premium coal company, and I'll refer to them throughout my argument today as Southern just for ease of purpose. Southern asked this court to address a very narrow issue, and that is, did the district court bear as a matter of law in its interpretation of a 2014 consent decree in finding Southern liable for stipulated penalties for alleged general violations of Clean Water Acts? Let me get one point cleared up to begin. Do you all agree, and I'll ask it to the other side too, do you all agree that consent decrees are interpreted according to normal contract principles, and if so, which state's contract law applies in this case? Yes, Your Honor. Two thoughts. I think all the parties agree that contract law applies, at least in the briefs and up until this point, and because the contract occurred in Virginia, it's Virginia law, but you will see that Virginia law actually pretty much follows the federal law as well, so I don't think that there would be much of a difference either way because they follow the precedent of U.S. v. North America and whatnot, so I don't think that that would impact anything otherwise. The answer to this question, though, the issue is, is the district did err because there is absolutely no language, I'm going to say that again, there is absolutely no language in the consent decree, especially in the paragraphs identified by the government, that even mention the word Clean Water Act, and since there's a complete lack of any language whatsoever regarding the Clean Water Act, you can see that the district court's exercise was not an exercise in plain language interpretation, rather in terms of age of construction that have been specifically rejected by the United States Supreme Court. The Supreme Court explained the importance of this appeal in United States v. Armour at 402 U.S. 673 in 1971, and it explained that because, and explained that because decrees are, yeah, because the defendant has by decree wages right to litigate the issues raised, the right guarantee to him by the due process clause, the conditions upon which is given that right must be respected, and the agreement must be construed as it is written, and not as it might have been written had everything ended up in full litigation. The Supreme Court saw this issue as a due process fairness issue. Let me ask you about the permits and the requirement to keep a permit. The consent decree has a number of provisions that are based on or keyed to a permit, right, like the the effluent discharges, right, they have to be kept below permit levels. The sampling has to be done as per the permit. There's all the, there's a number of requirements that have to do with staying within your permit, and then you have paragraph 29 that says when compliance with any obligation requires a permit, you have to make sure that you're timely applying and keeping the permits. So, why doesn't that resolve the question of whether the consent decree required Southern to apply for and maintain permits? Yes, there's a couple of answers to that question. First of all, the answer is that NPDES permits, all of the NPDES permits here, there's only three allegations, so a total of $3,000 stipulated penalties come from a violation of the NPDES permits, the requirement in the permit, and by the way, the allegation says that they shall timely apply for a permit, and because they didn't, the permits expired on one day, and then after that there were violations. In fact, the government is briefed at page five. What could, what the consent decree uses over and over, the word permit, in paragraph 20, 22, paragraph 29, I think part of paragraph 47, 45, and what else could that mean other than the CWA permits? And what else could it mean other than those permits? Is your problem that they don't put CWA permit in front of it? We don't put CWA, those initials in front of the word permit? Your Honor, that's, and piggybacking off of what Judge Rushing's comment was, and that is correct, but there is a very big distinction between a violation of an NPDES permit and the Clean Water Act. Well, I'm not, I didn't ask about that, because I agree with you, there's a difference between violating a permit and violating the Clean Water Act. What I'm asking is why can't I tell that you were required to keep a permit, right? You also, your client also was fined for not keeping a permit, not maintaining a permit, and it seems like the consent decree, as Judge Wilkinson was pointing out, has all sorts of obligations that have to do with, you know, complying with your permit, and then paragraph 29 says if you have to comply with a permit, you need to make sure you're applying for it and maintaining a permit. Your Honor, paragraph 29 actually isn't even talking about NPDES permit. How do I know that? I'll tell you how you knew that, Your Honor, and that is, paragraph 29 is a procedure, imposes a procedure requirement. In fact, every single paragraph in section 6 impose procedure requirements that require a trigger, a condition precedent before they're applicable. Paragraph 29 says when work obligations require something, then you must apply for the permits, and the permits here is talking about, we have a perfect example. The government sent a letter after its demand letter to Southern, and Tennessee sent a letter and said, guys, let me tell you how this works, and they said, you have to do some injunctive work in Tennessee, and while you're doing that injunctive work in Tennessee, keep this in mind. You're going, if you disturb greater than five acres and fixing the site, you have to get a stormwater permit. Yeah, it might cover those permits too, but it wasn't the district court right in saying if this consent decree doesn't include a requirement for you to maintain a permit, then it requires almost nothing, because so many of these obligations have to do with making sure that your discharges are below permit levels. You're sampling in accordance with your permit, and if Southern can say, well, we just stopped applying for permits, no problem, no consent decree violation. Isn't that a little backward? No, Your Honor, it's not backward, because it's the way the court is intended, and let me tell you, I think it's important to understand how Section 8 operates the financial assurance, because it actually fixes the exact problem you're talking about. Section 6 provides for financial assurances, and the way that it worked, it required two things from Southern. They had to establish a $4.5 million line of credit, and they had to establish a trust, and the way that that section operates now is, if the government believes, and there's two different categories under 63 of work, there's the work that's required by the consent decree in Section 6, 7, and 9, and then it says, and additionally, any additional requirements, and the additional requirements talks about NPDES permits, I mean NPDES permitting. I understand either party's incentives in this case, because the penalties under the Clean Water Act seem to be more harsh than the consent decree, and then why would you want to get out from under the consent decree if that's true? Your Honor, the reason would be that we believe that the delays in obtaining the permits weren't our fault. We believe that the state's delayed, and we're getting penalized, because the state wouldn't issue the permits on time. We were late in applying for them, but then it took them two years to apply to then issue the permit, so we think we would be better off with an original action, which is an option that the government had. In other words, let me make sure, you don't want to be bound by this consent decree. You want the Clean Water Act provisions applied to you? Under these facts, the answer is yes. I think that, and the reason is because that's not the agreement we reached, Your Honor, and that goes back to that rushing question. If you look at the way 63 works, it gives a solution to the problem of, well, this is going to be an absurdity, and the way that it gives that an option is they establish a $4.5 million line of credit. They had to establish a trust. If the government wants any of the things done that's in the definition of work, all that... But listening to you, where are you going? The way you want to interpret this consent decree is it would leave the waters of the affected states in worse condition than they were before the suit was filed, and you're reading it also in a manner that gives you a green light and free license to violate the Clean Water Act almost in perpetuity. I mean, it seems to me that the overall thrust of your position is to leave the Clean Water Act and the efforts that have been taken to enforce it in tatters. Your Honor, the answer is that's simply not the case, and the reason is that the consent decree has been in place for five years. In fact... But let me just... What reason is there to refer to these permits if they didn't involve applying for the permit, and once you got the permit, complying with the permit? That's where all of these... Every one of these provisions are directed toward permit compliance. Also, you knew going in here that the whole structure of the Clean Water Act is built on and operative provision of this statute has no application, notwithstanding the repeated references to your obligations with respect to permit compliance. I don't understand in just a few words of plain English what is deficient about this consent decree or how it can possibly be interpreted in a way that says, oh, no problem. You can ignore the permits at will. Your Honor, the argument you've made is the exact argument that the government made in U.S. v. Armour, and that was an anti-competition. It involved the Sherman Act, and what the government argued there is... The facts of Armour are somewhat important here. In Armour, it was prevented from doing certain activities under the consent decree, and they were acquired by Greyhound. Greyhound acquired them, and then the issue was can Greyhound... Greyhound was involved in the very activities that the consent decree prevented Armour from doing, and then the question was, well, can that happen? The government argued, even though there's not any language there, but the purpose of the consent decree was to do that. What you're asking us to do is to ignore the language that's right in front of us. I guess the most direct language is in paragraph 22, and it says, Southern Coal shall perform the work required by the decree, and this is in quotes, in compliance with the requirements of all applicable laws, regulations, and permits. What you're asking us to do is to look at that and not believe what tell us. I mean, you're arguing against what is stated in the consent decree in the clearest possible language. Your Honor, with all due respect, that's not what paragraph 22 says. 22 has a condition precedent. It says, when doing the work required by the consent decree, that is a requirement. The government's obligation is to point to somewhere in the consent decree that require us obtaining the NPDES permit. That work is not there. All of the obligation in the consent decree, they can do most of those obligations even without a permit, so those would still be enforceable, and second, 63, the government can obtain the permit themselves through the financial insurance section. That's the purpose of it. It says that under 63, the government can go and say, here's the money. Give it to the trustee. Trustee, complete the work that's in paragraph 63. So there is never going to be an opportunity for there not to be a permit. The government has that solution, and that's the way the party's meant for that to be. In fact, if you look at the language of paragraph 63, it divides it into two types of work. The first one says section six, section seven, section nine, and then it says, in any additional requirements, and any additional requirements required by the NPDES permit, the party's intended for stormwater, not for stormwater, but for NPDES compliance to be controlled by the financial insurance section. The sections of 22 and 29, those are all procedural requirements. There is not a substantive requirement in there. In fact, if you were to put 22, 29, and 63, and that was the only anything, because the first one required conditions, precedents to be met. They have to point the language that says, seller, you must get a permit. And in fact, in front of the district court, we provided three instances of consent decrees that have the exact language of paragraph 22 and 29. But guess what else they had in it? They had an affirmative obligation that says this, defendant shall comply with the NPDES permits. Defendant shall comply with the Clean Water Act. There's none of that language here because the party's intended for compliance with NPDES permits to be covered through the financial insurance section and not otherwise. Now, if you- So council, in addition to paragraph 22, 29, paragraph 47 actually goes so far as to set forth requirements and the necessity for monitoring compliance and implementing responses when you're out of compliance. And then paragraph 63, or yeah, 63, says, defines work as broadly taking, quote, for the term of the consent decree. And the problem you have is that this not just in one place, but over and over and over, the requirements of monitoring violations and complying with requirements are mentioned. I mean, this is, there's a drumbeat of language in this consent decree necessitating the compliance. And I find it hard to believe that you entered this kind of consent decree with any other understanding or expectation. Your Honor, again, I would point to Armour. And the reason is because that's the exact same argument that the government made, that there was no language that required or prevented Greyhound from purchasing. And they said, even though the entire consent decree is about the Sherman Act, even though it may prevent it, and maybe you can use these words, even though you're asking us to do, well, not, I mean, it's going to result in the same evils. And that's the word that they use in Armour. Even though it's going to result in the same evils, the language isn't there. And if the language isn't there, the government can bring an action under the Clean Water Act. And in fact, if you look at all of the requirements for the NPDS permit, we agree with that. All right, counsel, you have some time for rebuttal. And I'll ask my colleagues if they have any questions. Otherwise, we'll prepare to hear from you in rebuttal, okay? Do either of you have any questions? No. Mr. Frankel? Thank you, Your Honor. Good morning, and may it please the court. David Frankel on behalf of the United States. So the consent decree here was reached after extensive negotiations between the parties to resolve allegations that defendants had committed systemic, massive Clean Water Act violations. Included among over 23,000 plus individual violations were numerous violations of unauthorized discharge without a valid NPDES permit in place. Can I ask you a kind of a clarifying question about the penalties here? It seems like there are a few different categories, right? There are penalties for not maintaining a permit. There were penalties for discharges in violation of a permit, and there are penalties for unpermitted discharges. And those are all different bases, right? That's right. There are daily violations for those three different categories here. And the decree defines the affluent limit violations in terms of the permit, right? So if a discharge is made in excess of what's allowed by the permit, then that's a consent decree violation. That is one kind of violation of the consent decree, yes. And if a facility doesn't have a permit and it makes a discharge, that's not a violation of a Clean Water Act violation. It is a Clean Water Act violation and also a violation of the consent decree, which anticipates that defendants will have permits. They will attain and maintain permits at all of their discharge locations. That's my sticking point, is where in the consent decree does it require or, I guess, prohibit Southern from making unpermitted discharges? So if they make unpermitted discharges, then, among other things, it is a violation of the underlying laws. The Clean Water Act, as well as the state laws that the state law cognates to the Clean Water Act, require that permits be in place and that there be no unauthorized discharge pursuant to those permits. Right, but we agree, right, it's different to have a discharge that violates a permit versus a discharge, an unpermitted discharge. So those are two different things under the Clean Water Act. They are different things under the Clean Water Act. And I would say there's numerous provisions here that presuppose that an NPDES permit will be in place. And so if there's any action that occurs, including an unauthorized discharge without an NPDES permit in place, that is a violation. Paragraph 47, for example, talks about a whole set of actions that discharges have to comply with applicable NPDES permits. So if there's not an NPDES permit there in the first place, then any discharge at all is a violation of the obligation of the consent decree. If the consent decree says you have to comply with your permits and discharges have to be below the permit level and the applicable permit, that's what it says, but you don't have a permit, then there's no applicable permit, right? Isn't that kind of obvious? Well, I mean, I do think it's helpful to step back for a second here. And the consent decree was designed to encompass violations, including violations of unauthorized discharge without a permit. And I think it makes sense to interpret the decree, to interpret the scope of the decree and the scope of the decree's coverage, commensurate with the scope of violations that led to the decree. This is context and circumstances that this court is perfectly capable of considering. The consent decree itself specifically talks about the complaint and the underlying violations in several places. And so I think this is all... It deals with those violations in a certain way, right? It has paragraphs and paragraphs that lay out the to maintain permits and to comply with those permits. But there's kind of a separate question of, well, if they don't have a permit and make a discharge, what in the consent decree requires them to kind of comply with every obligation of the Clean Water Act, regardless? Sure. So I guess I would parse this out in a few different ways. I think, first of all, Your Honor, is making an argument that is not an argument defendants have made. A defendant's they have no obligation to maintain Clean Water Act NPDES permits. They have not made an argument that even if they had to, then... I was going to say, I mean, your friend on the other side just said, nothing in the consent decree requires, says you must comply with the Clean Water Act, right? And every Clean Water Act violation is a violation of this consent decree. Instead, it says when you're performing the work required, you should comply with various laws. But there's really no argument that that's an independent, freestanding obligation to comply with all federal and state laws. Like it's not a consent decree violation for them to make a misstatement in a securities filing, right? That would be an exaggerated reading of paragraph 22. Right. No, I think that's fair. But again, paragraph 22 does talk about all applicable federal, state, and local laws, regulations, and permits. And so there is one obligation that goes to the NPDES permits that the decree is replete with saying that the specific facilities and outfalls have to have. But there is also an underlying obligation that they comply with all applicable laws when doing any work under the consent decree. How much of a problem or actual or practical problem are we dealing here where something is in compliance with the permit, but at the same time is not in compliance with the Clean Water Act? Is that likely to be the case? Or is compliance with the permit, by and large, sweeping the great majority of discharges? I mean, I think it sweeps in really everything relevant. The only issue would be if there is an NPDES permit that is in place, there is an argument that there is no permit obligation not to discharge. At least that's how I understand Judge Rushing's argument. But aside from that discrete, and again, that would be three of the daily violations of really a vast array of violations that are underlying the multimillion. I mean, I understand what their argument is, is that they're not the restriction that under which they chafe was the permitting restrictions. And as I understand their argument, it is really essentially aimed at we don't want to have to comply with all these permits and the monitoring of them and the discharge of them, because the permits themselves really express in the most precise manner what the defendant's read. It could probably be read to prohibit any Clean Water Act discharge, which permitted or unpermitted. But as a practical matter, they don't want to have to abide by these permits. And that seems to me what they're aiming at. That's right. And that is the heart of the decree, is attaining and maintaining compliance with NPDES. The other thing is, as I understand it, for purposes of this appeal, we're not really dealing with remedies and damages and the rest. That hasn't been, as I understand it, brought into question as much as whether the consent decree itself requires permitting compliance. Am I correct in that? That's right, Your Honor. The defendants in this case do not challenge the numerical amount of penalties imposed. I would say their only alternative argument that arguably gets in this realm is they say, well, maybe during the period these NPDES permits were active, they required renewal. So we would have three daily violations for renewal, but nothing beyond that. The defendant's whole argument is that they had no obligation to maintain NPDES permits in place. They don't care what happens beyond that. If we were to affirm the district court on that basic question, which is the permitting obligations and permitting violations, there would still, would there not be a number of remaining proceedings before the district court dealing with the exact amount of damages and the exact amount of penalties, I might add, or exactly what the status of non-permitting obligations were? What I'm looking at is, would an affirmance here wrap the case up or are there still additional proceedings before the district court that would have to take place? What do you say on that? There is nothing else required that this court, in affirming the decision below and affirming the district court's reasoning below, that would wrap up the entirety of the case. There really has not been the type of penalty-by-penalty dispute or disagreement with the amount of penalties imposed. Okay, and you're saying it would wrap up the entire dispute because these other things have not been brought into play by virtue of the appeal? That's right. So you're saying that the incentive to stay under this consent decree is, as you all just said, just wraps up the whole thing and there's nothing left to do. I'm sorry, can you repeat the question, Your Honor? Well, I'm trying to figure out what your incentive is to stay under this decree, because if you proceeded under the Clean Water Act and other statutes, you got a much bigger hammer in terms of penalties. Well, that's right. I would first note that proceeding under the consent decree is not an exclusive remedy, so we don't waive any right to go after defendants for Clean Water Act violations, but in theory, at least, proceeding under the consent decree should be a more streamlined, easy way to obtain penalties for violations. I mean, we're caught up, I think, in this attempt to obtain an end run around the consent decree with the arguments that defendants are making here, which is why this has turned into the ball of wax that it has, but at least in theory, that proceeding under the consent decree should be a quicker, more streamlined way to get penalties, which is why we did that in the first instance. But certainly, we still have available to us, no matter the outcome of this case, going after them under the Clean Water Act as well. I do think that Your Honors appreciate the argument that we've made in terms of how to read the decree. I think it might be useful just to quickly walk through one provision, just to give a more granular understanding of how we're reading paragraphs 22 and 29. So one of the obligations in paragraph 45, and this is at J129, says defendants shall conduct outlet inspections as required by the NPDES permits applicable to such sites. So performing outlet inspections as required by the applicable NPDES permits is, in the words of paragraph 22, work required by this consent decree that can only be performed in compliance with all applicable laws and permits if an NPDES permit is in place. Then paragraph 29, because this is a compliance obligation under the decree, invokes a requirement that defendants submit timely and complete applications to maintain those permits in place. I did also want to quickly talk about defendants' interpretation of paragraph 63, a sort of an alternative remedial scheme in this case. First, it's just an important admission. They agree that paragraph 63 requires that they maintain NPDES permits in place, but their argument is that work, and this is capital W work, is something other than a requirement of the decree. And first, stipulated penalties accrue for any violation of any requirement. So if 63 imposes any requirement, then it too would be a grounds for daily penalties. And I point this court to the language in paragraph 67, which specifically says that the failure to perform the work puts defendants in default, it leaves them deficient, and if defendants, once they're advised of a default under paragraph 63, they must perform the prescribed work. So this suggestion that paragraph 63 describes things that are not requirements of the decree is just wrong. Things that are required under paragraph 63, if not done, are also breaches of the decree that give rise to stipulated penalties. One thing you mentioned in your brief, you say Southern Coal's observation that paragraphs 22 and 29 do not explicitly mention the CWA permitting is unpersuasive. But, you know, they do mention permitting. I mean, I don't understand the argument here because Southern Coal is flatly wrong, isn't it? I mean, those sections that they reference do mention permitting. Yes, the decree is replete with requirements that defendants obtain. So how can it just be unpersuasive? It's just flatly wrong. Isn't it? I mean, because what other permits are there? I mean, are we talking about Martian permits? The only permit that could be would be a CWA, wouldn't it? That's exactly right. I mean, if there is one permit that is unequivocally required, it is the Clean Water Act NPDES permits. That is the heart of the decree. That is the basis from which all of the obligations on the decree depend and explicitly talk about. That's right. I mean, that's the foundation stone, isn't it, to the Clean Water Act? It is. The entire premise of the Clean Water Act is to make sure that discharges only occur in compliance with valid NPDES permits. And it's an end run around the Clean Water Act, and it's an end run around this decree, which was designed to resolve systemic Clean Water Act violations to suggest that they can get out of their obligations by failing to timely renew their Clean Water Act permits. I mean, it seems to me that their argument was that this consent decree, the lengthy negotiated consent decree amounted to nothing. And I can't see what obligations they say they are under. They're quick to tell us what obligations they're not under in their view. But they have no reading to say we recognize that we do have certain obligations, and here's what they are. But they don't say that. That's right, Your Honor. I entirely agree. I'm happy to answer any further questions that the panel may have. Judge Rauschen, Judge Floyd, do you all have any further questions of this gentleman? Yes, sir. All right. Let's move. Let's hear some from Mr. Frankel in Roboto. Yes, Your Honor. Let me start by saying this. Southern is not trying to get out of the consent decree or the permits. In fact, we have 172 permits. That's in the record. We had a manager that mistakenly missed deadlines to file four or five permits. And then we filed those permits, and they were subsequently issued. Out of the 172, we still have them. We're not trying not to comply with permits. We filed the applications. We have them. Also, under Section 63, if we didn't, the government can give the money to the trustee, and the trustee has to get the permits. There's no way that we can get out from under these permits. That is not what the argument is. The argument simply is, and we're spending a lot of time on NPDES permits, and I think Judge Rushing pointed out, our argument has to do with the Clean Water Act. Once those permits expired, there were nullities. There were legal nullities. You cannot violate a permit that no longer exists. Every single violation that they point out, except for three, happened after the date all the permits expired. So they have to be Clean Water Act violations. Now, if you look at paragraphs 22, 29, and 63, the Clean Water Act does not mention a single thing. In fact, it's not mentioned in the entire section. Well, do you agree that there's penalties for not complying with the permits, which are the three you're talking about? Then there's penalties for not having a permit, and then there's penalties for unpermitted discharges, things that you did without a permit that violates the Clean Water Act. So those are three different categories, right? That's correct. Okay. And the first one is a permit review permit, arguably, is a violation of the NPDES permits. The other two only can be classified as Clean Water Act violations. And if you look at the language of the decree, not only do the paragraphs that the government points out seem to be violated, they don't even mention the decree. They don't mention applicable environmental laws, which is a defined term in the decree that includes the mention a single thing in the entire section. And you have to understand somehow that the decree imposes an obligation to follow the Clean Water Act. It does not. It's the same exact argument that was made in armor and was rejected in armor. Your Honor, with my few seconds that I have left, number one is the district court specifically relied on his subjective view of purpose. He stated that he didn't accept our argument because that would defeat the entire purpose of the consent decree. That's the exact argument, again, in armor. And this court has specifically rejected that and found that the error in consumer finance protections versus plot at 957 F3, 545, seeing that that is an error. And in fact, throughout the argument, uh, yes, NPDES permits are part of it. We won't comply with our NPDES permits, but we can do that because the NPDES permits will always be in place. I see that my turn has expired. Uh, we may ask this court to adjourn. All right. Thank you. Thank you very much. Thank you. All right. We will proceed into our final case.
judges: J. Harvie Wilkinson III, Allison J. Rushing, Henry F. Floyd